## THE COLUMBUS.

### THE SCOWS NOS. 6, 8, 11, AND 12.

### MUNN v. THE COLUMBUS et al.

(District Court, E. D. Pennsylvania. January 8, 1895.)

### No. 25.

ADMIRALTY—SERVICES RENDERED TO SEVERAL VESSELS—JOINT LIEN.

The P. Dredging Co., owning three dredges and fifteen scows, which were employed, under a contract, in removing obstructions in a river, hired libelant's tugboats to tow the scows from the place where the dredging was going on to the place where they were to be discharged, and back again, and to move the dredges from place to place, as their work progressed. Neither scows nor dredges would have been of any use alone; neither had any means of propulsion or steering, and without the use of tugs they could do nothing. Libelant's tugboats performed the work and towed the various scows back and forth many times, no itemized account being kept of the towage of any particular scow or dredge. *Held*, that libelant had no joint lien on the several scows and dredges for the entire price of the services separately rendered to those vessels.

This was a libel by Frank W. Munn, managing owner of the tugboats Philadelphia and Alert, against the dredge Columbus and four

scows, for towage. The cause was heard on an agreed statement of facts:

"It is hereby agreed that the above case shall be heard finally upon the following facts, reserving the right to either party to appeal: The libelant is part owner and managing owner of the tugs Philadelphia and Alert. In the year 1891, James A. Mundy & Co. entered into a contract with the United States for the removal of Windmill and other islands in the Delaware river, opposite Philadelphia, and for the deposit of the material removed therefrom upon League island. To carry out this work, James A. Mundy and others organized under the laws of the state of New Jersey a corporation known as the Philadelphia Dredging Company, and this dredging company, or James A. Mundy and others associated with him, purchased and secured a dredging plant,—i. e. a number of dredges, scows, and towboats,—to be used in the same operation of dredging for the prosecution of the work in the removal of these islands. This plant was made up of two dredging plants, one known as the 'Philadelphia plant' and the other as the 'Thompson plant.' The Philadelphia dredging plant consisted of the dredge Starbuck and three bottom-dumping scows, Nos. 13, 14, and 15. The Thompson plant consisted of the dredges Columbus, America, and Norwalk, and the tug Bowen, and the scows Nos. 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12. These two plants were used and operated as one by the Philadelphia Dredging Company. The dredges above mentioned were anchored at the islands which were to be removed, and as the earth was excavated it was deposited upon the scows by the dredges in the manner usual in dredging operations. By the contract with the United States government the material excavated from the islands was required to be deposited upon League island, at a distance of about six miles from the scene of the dredging operation; and to receive the excavated material the above-mentioned scows were employed. They were bottom-dumping scows, constructed in the usual manner, and lacked any facilities whatever for propulsion, either steam or sail, or for steering, and it therefore became necessary to supply additional tugboats to tow the loaded scows down the river to League island and the empty scows back to the dredges to be refilled. In 1892 the Philadelphia Dredging Company, or James A. Mundy and those operating and owning the said plants, entered into an arrangement with libelant for the towage of the scows from the dredges to League island and back, and for such moving of the dredges as might be necessary, and agreed to pay the sum of $26 per day for the tug Philadelphia and $30 per day for the tug Alert. During the months of July and August, 1892, the tug Philadelphia rendered said towage service properly for 30 days, during November 26 days, and during December 20 days, for which the sum of $2,054 became due to libelant. During July, 1892, the tug Alert rendered said towage services properly for 4 nights at $30 per night, and 4½ hours' time at $4 per hour, for which the sum of $138 became due to libelant. The dredges above named were not supplied with any mud pockets, or dumps, except the said scows, and had no means of propulsion, and, in order to be used as dredges, were required to be operated in conjunction with one or more scows, as was done in this case, to receive the mud dredged, and were required to be advanced or moved from time to time as the dredging work progressed. The dredges excavated the earth and deposited it on the bottom-dumping scows. After the scows were loaded, they were, either singly, or, more usually, in a tow consisting of several, towed down the river to League island, and were there dumped over the receiver of the mud pump, the light scows being towed back to the dredge to be reloaded, the round trip occupying about three-quarters of a day. The said towage services were necessary to enable the work of dredging to be carried on, as without the use of the scows to carry the excavated material the dredges would have been useless for this work, and the scows would have been of no use for this work without the services of the dredges. The scows bore no name, but were known by numbers only. When brought back empty, the various scows were towed to the dredges, to be filled, in accordance with the directions of the superintendents in charge of the dredging work. No itemized account of the towing of the dredges or of each scow to and from each dredge or the towage of the dredges was kept by the

.tugs. This suit was brought by libelant against the dredges Columbus. America, and Starbuck, and the scows Nos. 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12. 13, and 14, and of these the marshal attached the dredge Columbus and scows 6, 8, 11, and 12. The dredges and scows against which the suit was brought were the only ones within the jurisdiction of the court at that time."

John F. Lewis and Horace L. Cheyney, for libelant.

J. Rodman Paul, N. Dubois Miller, and Biddle & Ward, for respondents.

BUTLER, District Judge. The libelant has proceeded on a supposed joint lien against the several vessels attached, for the entire contract price of all the services separately rendered to these vessels, and to others not attached which were engaged in the same work. The proceeding is anomalous; no precedent for it is to be found in the history of admiralty jurisprudence. It is doubtless an experiment suggested by the libelant's necessities. The dredging company, having failed to keep its contract and being insolvent, the libelant must lose compensation for his services unless he can establish a lien such as he sets up. He might have kept an account with each vessel, and have proceeded against her separately for it, but looking, evidently, to the dredging company alone, for payment, he failed to do this. Now, to overcome the difficulty, he seeks to treat all the vessels as one, and supposes he may do so, because they were engaged in the same work, and thus hopes to recover his entire claim for the services rendered to all from such as he has been able to catch.

That he cannot do this seems plain. Where several vessels are physically connected, as in the case of a tow for instance, they may be considered one for certain purposes, but under no other circumstances. It is supposed The Alabama, 22 Fed. 449, is authority to the contrary; but it is not. The only question there was whether a dredge is a vessel, and liable to admiralty lien. The court held that it is, because it is intended for use in the water, in connection with scows. Whether the decision is justifiable has been doubted; but it has been followed, and is probably right. It certainly is not authority, however, for the proposition that several dredges and any number of scows which may happen to be employed with them, may be treated as one vessel, and consequently be made the subject of a joint lien for services rendered to any one of them. The courts are jealous of the extension of admiralty liens, and more inclined to restrict than to extend them. The Mary Morgan, 28 Fed. 197. If this libel is sustained it will only be necessary hereafter to call the several vessels belonging to a Line engaged in the same service, a "plant" (a new term in the admiralty) to render each and all liable to lien for services rendered either. The second point made, to wit, that the libelant did not render the services on the faith of the vessels, but in reliance on the contract, need not be considered.

The libel must be dismissed.